## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 15-24230-Civ-TORRES

NICOLE WEBB, individually and
as Personal Representative for the
Estate of Phillip Webb, Deceased,

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____/

## ORDER ON DEFENDANT'S *DAUBERT* MOTION
## TO STRIKE PLAINTIFF'S EXPERT WITNESS RANDALL JAQUES

This matter is before the Court on Carnival Corporation's ("Defendant") *Daubert* Motion to Strike ("Motion") Nicole Webb's ("Plaintiff") expert witness Randall Jaques ("Mr. Jaques"). [D.E. 53]. On November 10, 2016, Plaintiff timely filed her response [D.E. 74] and Defendant replied on November 21, 2016. [D.E. 75]. Therefore, this Motion is now ripe for disposition. Having reviewed the Motion, response, reply, and relevant authority, and for the reasons discussed below, Defendant's Motion is **GRANTED in part** and **DENIED in part**.

## I.     BACKGROUND

This case involves the unfortunate and tragic death of Phillip "Aaron" Webb (the "Decedent") while cruising aboard the *Carnival Dream*. Prior to his passing, the Decedent (30 years of age) resided in Missouri with his ex-wife, Plaintiff, and

their three children, Brayden Alijah (12 years old), Addison (7 years old), and Destiny (3 years old).   In January 2015, the Decedent and Plaintiff went on a cruise with two friends to Cozumel, Mexico.   During the first day at sea, in a span of twelve hours, twenty-two alcoholic beverages were purportedly served to Plaintiff and the Decedent.   Fifteen of the twenty-two alcoholic beverages were Long Island Iced Teas, which includes gin, tequila, vodka, rum and triple sec, totaling approximately 2.5 ounces of alcohol per drink.   At around 12:00 am, the Decedent, Plaintiff and their two friends were in the casino bar watching a live musical performer.   At some point, the Decedent fell off of his barstool due to his intoxication.   After the fall, Plaintiff and two friends purportedly told the bartender to stop serving the Decedent. At this moment, the Decedent allegedly became aggressive and requested the bartender to serve another drink, to which the bartender served the Decedent another Long Island Iced Tea.

Shortly thereafter, Plaintiff and the two friends went to an adjacent club to dance, leaving the Decedent at the casino bar because he wanted to smoke a cigarette.   At approximately 12:30 am, the Decedent went back to his cabin alone. At approximately 1:05 am, the Decedent fell over his cabin balcony railing, striking his head on the deck below.   At 1:35 am, Carnival Security found the Decedent lying lifeless on the deck.   The Decedent's blood alcohol content was .369 g/dl, over four times the legal limit.   As a result, Plaintiff contends that Defendant negligently overserved the Decedent alcohol and brings this negligence claim under the Death on the High Seas Act.

## II. APPLICABLE PRINCIPLES AND LAW

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony. *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the admissibility of expert testimony is governed by Fed. R. Evid. 702.[1] The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.").

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). The

---

[1] Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as "gatekeeper," its duty is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)

To facilitate this process, district courts engage in a three part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to the aforementioned requirements as the "qualification," "reliability," and "helpfulness" prongs and while they "remain distinct concepts"; "the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

Furthermore, in determining the *reliability* of a scientific expert opinion, the Eleventh Circuit considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at 580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

## III.    ANALYSIS

The focus of Defendant's Motion is that Plaintiff's expert, Mr. Jaques, presents himself as a maritime safety expert, but is allegedly unqualified to render any opinions in this case because they venture far beyond issues of safety and security.

Defendant further argues that Mr. Jaques' bare anecdotal opinions are not supported by any methodology and contain conclusory statements that simply mirror an attorney's arguments. Therefore, Defendant claims that Mr. Jaques' opinions are inadmissible because (1) they will not assist the trier of fact, (2) they are unreliable and unsupported by any methodology, and (3) Mr. Jaques is unqualified. Accordingly, Defendant seeks to strike Mr. Jaques' as an expert witness because he fails to satisfy any of the requirements of FED. R. EVID. 702, 703, and *Daubert*.[2]

Before discussing the parties' respective arguments, a brief review of Mr. Jaques' professional background will be pertinent to the disposition of Defendant's Motion. Mr. Jaques' experience has been primarily in law enforcement. [D.E. 53-1 at 2]. Mr. Jaques began his career in the maritime industry in 1991 as a chief shipboard security officer for Carnival Corporation, working on approximately four different vessels. As a chief security officer, Mr. Jaques was in charge of training new crew members, training in shipboard policies and procedures, overviewing and overseeing the shipboard safety of all passengers and crew, as well as ensuring that the shipboard management system was followed.

At the beginning of his career, Mr. Jaques trained under the STCW-95 of the United States Coast Guard and became a qualified seaman. STCW-95 is a form of training required by all crew members servicing passengers on cruise vessels. Any service-oriented crew member that has direct interaction with passengers goes

---

[2]     Defendant points out that Mr. Jaques is no stranger to *Daubert* challenges as his testimony is frequently limited or stricken by courts in this District.

through STCW-95 training. The training allows service-oriented crew members to interact with passengers and spot human behavior problems. In 2015, Mr. Jaques earned updated STCW-95 certificates in human behavior and safety at sea.

While employed with Carnival as a security officer in the early 1990s, Mr. Jaques was a safety instructor, dive instructor, swimming instructor and a new employee instructor under the executive committee. Mr. Jaques was tasked with teaching new Carnival employees various STCW-95 courses that had to do with human behavior, drugs, fights, passengers requiring immediate detention, and passengers that needed to be monitored. In 2000, Mr. Jaques became a security manager for Norwegian Cruise Lines, working on three different vessels. In 2006, Mr. Jaques worked for Disney Cruise Lines as a safety officer and shipboard security manager. In 2008, Mr. Jaques worked for Holland America Line as a safety officer and shipboard security officer.

In addition to his experience in cruise line safety and security, Mr. Jaques served as a police officer in Miami, Florida. Specifically, Mr. Jaques was a drug, alcohol and recognition officer, as well as a traffic homicide officer. Since 2008, Mr. Jaques has exclusively engaged in expert work and consulting. [D.E. 53-1 at 3, D.E. 53-2, at 17]. Mr. Jaques has also served as an expert or consultant in cases with Plaintiff's counsel on 40-60 prior occasions. [D.E. 1, at 3]. In light of Mr. Jaques professional background, we will discuss the parties' arguments in turn.

## A.  *Helpfulness*

Defendant's first argument, in support of its Motion, is that Mr. Jaques' opinions will not assist or help the trier of fact.   "[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments."  *Frazier*, 387 F.3d at 1262-63 (citations omitted).   Furthermore, while "[a]n expert may testify as to his opinions on an ultimate issue of fact . . . he 'may not testify as to his opinion regarding ultimate legal conclusions.'"  *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) (quoting *United States v. Delatorre,* 308 Fed. Appx. 380, 383 (11th Cir. 2009)).   The Eleventh Circuit has also made clear that "merely telling the jury what result to reach is unhelpful and inappropriate."  *Umana-Fowler*, 49 F. Supp. 3d at 1122 (citing *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)).

Here, Defendant contends that Mr. Jaques' opinions are no different than an attorney's closing arguments because they merely opine on whether the Defendant breached its duty of care.   Defendant takes issue with these opinions because Mr. Jaques is purportedly attempting to usurp the role of a jury and go far beyond the realm of an admissible expert opinion.   Defendant also argues that parts of Mr. Jaques' expert report – with respect to allegations that the Defendant is hiding surveillance footage – are unhelpful because it is false, confusing, and unfairly prejudicial.   Defendant claims that it produced all known surveillance footage of the Decedent on the night of the incident to law enforcement and Plaintiff, and that there

has been no indication of spoliation. Defendant argues that there is no evidence that any additional video footage exists and that Mr. Jaques knows nothing of the surveillance cameras on the cruise ship. Therefore, Mr. Jaques' opinions should allegedly be stricken because they lack the proper foundation and are impermissible under well-settled Eleventh Circuit precedent.

Plaintiff's response is that Mr. Jaques' testimony is crucial in several ways. First, Plaintiff argues that Mr. Jaques' testimony will help explain the maritime regulations to the trier of fact and how such regulations correlate with the details of this case. Second, Plaintiff contends that Mr. Jaques' testimony and insight as to the responsibilities and training of shipboard bartenders goes beyond the knowledge of a layperson and what is required by Carnival's policies and procedures. Third, Mr. Jaques purportedly has intimate knowledge concerning the required training on cruise ships and how crew members spot human behavior problems stemming from intoxication. As for Defendant's allegation that Mr. Jaques' expert report regarding surveillance footage is false, confusing, and unfairly prejudicial, Plaintiff argues that Mr. Jaques' testimony is actually quite helpful because of his intimate knowledge of internal policies and procedures.

Yet, Plaintiff's arguments are, in part, unpersuasive because Mr. Jaques' opinions are replete with impermissible legal conclusions. For example, in the first paragraph of Mr. Jaques' expert report, he asserts that Carnival breached its duty of care and was the direct cause of the Decedent being grossly overserved with alcohol and falling to his death. [D.E. 53-1]. The second paragraph further contends that

"Carnival Corporation is at fault for failing to provide reasonable safe conditions for the decedent during his voyage aboard the Carnival Dream." *Id*. Nearly every subsequent paragraph in Mr. Jaques' expert report follows this trend with statements that "Carnival Corporation is at fault" for failing to meet certain duties or procedures with respect to the Decedent's death.

The Eleventh Circuit has made clear that legal conclusions or statements instructing what conclusion the jury should reach are impermissible to pass muster under *Daubert*. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) ("[C]ourts must remain vigilant against the admission of legal conclusions") (citations & quotations omitted); *see also Montgomery*, 898 F.2d 1541 (11th Cir. 1990) ("An expert may not . . . merely tell the jury what result to reach."). "A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery*, 898 F.2d 1541 (citing *United States v. Poschwatta,* 829 F.2d 1477, 1483 (9th Cir. 1987); *United States v. Baskes,* 649 F.2d 471, 479 (7th Cir. 1980)).

Here, Mr. Jaques' expert report suffers from the same deficiencies as in *Higgs v. Costa Crociere S.p.A. Co.*, 2016 WL 4370012 (S.D. Fla. Jan. 12, 2016). In *Higgs*, Judge Cohn found that Mr. Jaques' expert report contained impermissible legal conclusions because it included statements that "Costa is at fault" and that the crew "was careless." As a result, Judge Cohn struck all of those statements because they ran afoul of Eleventh Circuit precedent and *Daubert*. The same reasoning applies here. Mr. Jaques rehashes the same opinions in this case with nearly identical legal

conclusions, except they apply to Carnival instead of Costa. The Court finds no reason to depart from the well-reasoned conclusion reached in *Higgs*. The bulk of Mr. Jaques' expert report is essentially boiled down to eight conclusory legal statements that Defendant is at fault for violating its own internal policies and procedures regarding alcohol, security, and intoxicated passengers. [D.E. 53-1 at 7-9]. Therefore, Mr. Jaques may not testify that "Carnival is at fault" or that Carnival breached its duty of care or failed to follow the proper procedures to protect an intoxicated individual. The statements in the expert report must also be stricken because they are ultimately legal conclusions. To this extent, Defendant's Motion is **GRANTED**.

However, Mr. Jaques' testimony and expert report on industry regulations for cruise safety practices is admissible because it goes "beyond the common knowledge of the average lay person" and "is helpful in establishing the applicable standard of care for Plaintiff's negligence claim." *Higgs*, 2016 WL 4370012, at *5. In addition, Mr. Jaques may testify about the Defendant's detailed policies and procedures that are in place to prevent the over service of alcohol to customers, including those procedures for what to do in the event of dealing with an intoxicated passenger. Both subjects are helpful to the trier of fact because they "offer[] more than what the lawyers for the parties can argue in closing arguments." *Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374, 1390 (M.D. Ga. 2014). To this extent, Defendant's Motion is **DENIED**. *Higgs*, 2016 WL 4370012, at *5 ("Jaques may offer expert testimony regarding industry standards for cruise ship safety practices").

11

As for the opinions in the expert report and testimony that relate to Defendant being at fault for failing to produce all the required video footage from the California *Dream* to Plaintiff, the Court finds that these statements are also improper. Specifically, Mr. Jaques' expert report makes the legal conclusion that "Carnival Corporation is at fault for failing to follow the Cruise Ship [S]ecurity and [S]afety [A]ct of 2010 . . . ." *Id*. at 9. Not only is this opinion based on an improper legal conclusion, Mr. Jaques' deposition testimony demonstrates that he had no basis for reaching this conclusion, other than pure speculation. Mr. Jaques has (1) never served on the California *Dream*, *see id*. at 48, does not know where the specific locations of the surveillance cameras are in the ship's casino, *see id*. at 48, and merely reached his conclusion because Defendant, on prior occasions, "does not provide[] its CCTV camera footage whenever asked for." *Id*. at 53. As Mr. Jaques testified, the basis for his opinion is that Defendant has – in unspecified prior circumstances – failed to produce all the relevant video footage, which allegedly also occurred here:

> Q: What do you believe happened to that video?
> A. Well, without -- not sounding that I'm being too critical, but it's been my past experience that, unlike NCL, Carnival Corporation does not provide its CCTV camera footage whenever asked for. Within the industry and with the Cruise Ship Security and Safety Act, it's very clear that especially, especially in a case such as this, which involves how do they know it couldn't have been foul play in the beginning. But in any respect, just to provide that video, which I know they have, and I know what those cameras can do and what they're capable of doing, it's something that they should have done.

*Id*. at 53-54.

Therefore, Mr. Jaques' opinion is inadmissible because "'[u]nder the regime of

*Daubert* . . . a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.'" *Allison,* 184 F.3d at 1316–17 (quoting *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir. 1996)). Because Mr. Jaques' expert report and testimony – with respect to allegations that Defendant is withholding video footage from Plaintiff in violation of federal law – is nothing more than a legal conclusion and lacks any credible support other than pure speculation, Defendant's Motion to this extent is **GRANTED**. *See, e.g. Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1365 (S.D. Fla. 2009) ("The fact that the opinion itself merely lists potential causes instead of drawing any conclusion underscores just how speculative it is"); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) ("[E]xpert evidence 'must have a valid scientific connection to the disputed facts in the case.'") (quoting *Allison,* 184 F.3d at 1312).

## B. *Qualifications*

Next, Defendant argues that Mr. Jaques is unqualified to give any expert testimony or opinion on the Decedent's level of intoxication. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 154 (1997) (stating that Rule 702 requires that the expert be qualified and that his testimony assist the trier of fact). An expert may be qualified to testify in multiple ways: "'by knowledge, skill, experience, training, or education'" and "not necessarily unqualified simply because her experience does not precisely match the matter at hand." *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1129 (citing *Maiz,* 253 F.3d at 665, 669). "Determining whether a witness is qualified to testify

13

as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting *Jack v. Glaxo Wellcome, Inc.,* 239 F.Supp.2d 1308, 1314–16 (N.D. Ga. 2002)). "In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." *Clena Investments, Inc.*, 280 F.R.D. at 661 (citing *City of Tuscaloosa,* 158 F.3d at 562–63).

Determining an expert's qualifications is not a stringent inquiry "and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *see also Johnson v. Big Lots Stores, Inc.,* 2008 WL 1930681, *14 (E.D .La. Apr. 29, 2008) (summarizing *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 507 n. 10 (5th Cir. 1999), as "explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination"); *see also Martinez v. Altec Indus., Inc.,* 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing,* 185 F.3d at 507 ("As long as some reasonable indication of qualifications is adduced . . . qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity")). After a review of the relevant issues and an expert's qualifications, "the determination regarding qualification to testify rests within the district court's discretion." *Clena Investments, Inc.*, 280 F.R.D. at 661 (citing *Berdeaux v. Gamble*

14

*Alden Life Ins. Co.,* 528 F.2d 987, 990 (5th Cir. 1976) (footnote omitted)).

Defendant's position is that Mr. Jaques has conceded that he is unqualified to render an expert opinion on the Decedent's level of intoxication at trial. Defendant notes that Mr. Jaques only has a law enforcement background and has merely served as a security officer on cruise ships. Hence, Defendant argues that Mr. Jaques has no experience in toxicology, responsible alcohol vending policies, nor medicine. Despite this lack of expertise, Mr. Jaques purportedly intends to opine on whether Defendant breached many of its internal policies and procedures and whether the Decedent was "grossly intoxicated" on the night of the incident. Because Mr. Jaques has only claimed to have expertise in detecting intoxicated persons in the field during his time as a police officer, he is allegedly unqualified as an expert witness in this case.

Plaintiff disputes Defendant's contention that Mr. Jaques is unqualified. Plaintiff contends that Mr. Jaques is expected to testify at trial, *inter alia*, that Defendant's failure to identify, observe and protect an overly-intoxicated passenger, as well as Defendant's failure to adhere to its own policies, procedures and SMS regarding the responsible service and sale of alcohol to passengers. In addition, Mr. Jaques is expected to testify regarding Defendant's crewmembers' failure to adhere to the training under STCW-95. Finally, Plaintiff contends that Mr. Jaques is expected to testify regarding the Decedent's level of intoxication on the night prior to the Decedent's passing because they are purportedly well within Mr. Jaques' expertise in marine safety and alcohol recognition.

However, Plaintiff's arguments are unpersuasive because Mr. Jaques' opinions and testimony are tethered to a toxicology report that found the Decedent's blood-alcohol concentration was .369 on the night of his death. Mr. Jaques testified that he is qualified to "give opinions regarding [the Decedent's] actual level of intoxication," even though he concedes that he is not a toxicologist. [D.E. 53-2 at 73]. And while Mr. Jaques claims to be an expert in "recognizing the level of intoxication of individuals in the field" due to his law enforcement background where he observed and arrested people for driving under the influence, *see id.* at 72, he obviously did not physically observe the Decedent in this case to know his level of intoxication. *See id.* at 73. Mr. Jaques also testified that he does not know how much alcohol the Decedent consumed other than a "tremendous amount" (which Mr. Jaques defines as "way too much"), *see id.* at 76, and could only approximate that the Decedent may have had "six, seven, eight, nine drinks." *See id.* at 76.

The problems with Mr. Jaques' testimony continue with respect to him being uncertain of (1) when the Decedent began to drink on the day of the incident, *see id.* at 76, (2) how the Decedent could have metabolized alcohol based on his weight and the time period in which he allegedly drank the alcohol, *see id.* at 77-78, and (3) how much alcohol was actually served in the Decedent's drinks. *See id.* at 89. Based on Mr. Jaques' deposition testimony, it is abundantly clear that he does not have the requisite qualifications to opine with any level of expertise on Decedent's level of intoxication in this case, aside from the fact that the Decedent consumed "too much" alcohol. None of Mr. Jaques' statements are scientific in any way and while Mr.

Jaques argues he has an extensive background in law enforcement and security, he never explains how this qualifies him to opine on the intoxication of the Decedent – particularly when Mr. Jaques was not onboard the cruise ship at the time of the Decedent's death. Because Mr. Jaques has no experience in toxicology, responsible alcohol vending policies, nor medicine, and has never served onboard the California *Dream*, he is unqualified to opine on the Decedent's level of intoxication and to this extent, Defendant's Motion is **GRANTED**.

C. *Methodology*

Defendant's final argument is that Mr. Jaques' opinions and testimony are inadmissible because they are not supported by any reliable methodology and fail to rely on a single study, article, or authority as support. "The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to 'scientific . . . knowledge,' since the adjective 'scientific' implies a grounding in science's methods and procedures, while the word 'knowledge' connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds." *Daubert*, 509 U.S. at 580. This entails an assessment of whether the "methodology underlying the testimony is scientifically valid." *Id*. at 592. The four non-exhaustive factors used to evaluate the reliability of a scientific expert opinion include:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific

community.

*Frazier*, 387 F.3d at 1262 (citations omitted).

Here, Defendant argues that Mr. Jaques' experience fails to provide "sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1262 (emphasis in original). As support, Defendant relies on *Farley v. Oceania Cruises, Inc.*, 2015 WL 1131015, at *1 (S.D. Fla. Mar. 12, 2015). In *Farley*, Judge O'Sullivan struck Mr. Jaques as an expert witness where he sought to provide maritime liability and safety opinions regarding "safety issues and the applicable standards of care and policies and procedures in the cruise ship industry for maintaining clear passageways for the safety of passengers and crew members and to opine regarding the cause of [the p]laintiff's fall . . . ." *Id*. Mr. Jaques opined that the cruise line was "careless and negligent" and that the cruise line was "at fault" for the passenger's injury. *Id*. The Court found that Mr. Jaques' methodology failed for several reasons because (1) "Mr. Jaques failed to inspect the vessel where the accident took place or interview any crew members," (2) "[h]e d[id] not cite to any publications or experiments to support his opinions with respect to lounge chair safety," and (3) "d[id] not provide a detailed explanation of how his experience supports his opinions or what materials he consulted (other than the policies and procedures of competitor cruise line operators) to reach his conclusions." *Id*. at *8.

Plaintiff argues in response that, contrary to Defendant's contentions, Mr. Jaques' methodology relied on more than his own experience and training, including:

(1) a video of the incident, (2) the deposition of Plaintiff, (3) bartender duties, (4) a deck log, and (5) a plethora of other materials. Plaintiff also takes issue with Defendant's suggestion that Mr. Jaques' experience cannot serve as the basis for his expert opinion. Plaintiff argues that Mr. Jaques supports each opinion with, not only his extensive experience and training, but with many items that distinguish Defendant's cases that suggest his expert opinion is inadmissible.

After full consideration of the parties' arguments, Mr. Jaques' methodology suffers from many of the same deficiencies identified in *Farley*. His expert report simply lists a number of conclusory statements without any foundation. He does not demonstrate whether he performed any analysis nor does he indicate whether his opinions were subject to any verification or peer review, or how his experience specifically informed his opinions. Neither his report nor his testimony references a single study, article, or authority to support his opinions. *See Johnson v. Carnival Corp.*, No. 07-20147-Civ-UNGARO (finding that "Plaintiff's assertions fall far short of demonstrating *how* Jaques' experience leads to his conclusions and opinions, *why* his experience is a sufficient basis for his opinions, and *how* his experience is reliably applied to the facts of Plaintiff's case.") (citations omitted).

The advisory committee notes for Rule 702 further illustrate how Mr. Jaques' reliance on his experience, and the various items mentioned in Plaintiff's response, fail to satisfy the reliability prong of *Daubert*:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and

how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'

*Sorrels v. NCL (Bahamas) Ltd.,* 2013 WL 6271522, at *6 (S.D. Fla. Dec.4, 2013) (quoting Fed. R. Evid. 702 advisory committee notes (2000 amends.) (emphasis added)). Most of Mr. Jaques' opinions and testimony are not "tethered to any supporting materials or sources" as there are no studies, peer-reviewed materials, treatises, sources, data nor anything else underlying his views. *Farley*, 2015 WL 1131015, at *7. Instead, his opinions are conclusory statements regarding Defendant's fault that is not tied to any methodology. Moreover, Mr. Jaques does not explain why the items he relied upon – in addition to his experience – provide a sufficient basis for his opinion, especially in light of the fact that they merely lead to legal conclusions. For the reasons stated above, Mr. Jaques' methodology does not satisfy *Daubert* and Defendant's Motion on this basis must be **GRANTED**.

## IV. CONCLUSION

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** that Defendant's *Daubert* Motion to Strike Plaintiff's expert witness Randall Jaques. [D.E. 53] is **GRANTED in part** and **DENIED in part**. Plaintiff's expert witness, Mr. Jaques, shall *only* be permitted to testify about (1) the Defendant's policies and procedures that were in place to prevent the over service of alcohol to customers, (2) the Defendant's procedures for what to do in the event of dealing with an intoxicated passenger, (3) the required training on cruise ships and how crew members spot human behavior problems stemming from intoxication, and (4) maritime regulations

that correlate with the details of this case.

**DONE AND ORDERED** in Chambers at Miami, Florida this 6th day of July, 2017.[3]


/s/ _Edwin G. Torres_
EDWIN G. TORRES
United States Magistrate Judge

---

[3]     Plaintiff did not request a _Daubert_ hearing on Defendant's Motion. Therefore, the Court is adjudicating the Motion solely on the record presented.